IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

ROCK AIRPORT OF PITTSBURGH, LLC,:  Bankruptcy No. 09-23155-CMB
       *Debtor*                            :  Chapter 11
                                         :  Related to Doc. Nos. 370, 398, & 424

IN RE:

RPP, LLC,                               :  Bankruptcy No. 13-20868-CMB  – *file at*
       *Debtor*                            :  Chapter 11

MANAGEMENT SCIENCE       :
ASSOCIATES, INC.,            :
       *Plaintiff*                        :  Adv. No. 13-2078-CMB
                                         :
v.                                          :  Related to Doc. Nos. 65 & 79
                                         :
RPP, LLC,                               :
       *Defendant*                   :

## **MEMORANDUM OPINION**

The matter before the Court is the selection of the appropriate method by which to transition the delivery of electricity to Management Science Associates, Inc. ("MSA"), currently supplied by an electrical grid owned by Rock Airport of Pittsburgh, LLC, ("Rock Airport") or RPP, LLC ("RPP", collectively "Debtors"),[1] to delivery via a direct electrical line from West Penn Power to MSA. In accordance with the May 31, 2013 Order of this Court, a design study by West Penn Power was commissioned to facilitate the transition. Following the completion of said design study, MSA filed *Management Science Associates, Inc.'s Motion to Accept, Approve*

---

[1]     This Court notes that the issue of whether the electrical grid is owned by Rock Airport or RPP is the subject of a separate adversary proceeding (Adv. No. 13-2349). For the purposes of this Memorandum Opinion, it is not necessary to decide the issue of ownership, and no statement made herein is intended to resolve the pending ownership issues or bind the Court in that proceeding. The grid will be referred to herein as belonging to the Debtors to avoid confusion.

1

*and Order Implementation of the West Penn Power Design Plan* ("Motion").[2] Rock Airport, as a debtor-out-of-possession, and RPP filed a Response opposing the Motion, to which MSA filed a Reply. Upon consideration of the numerous hearings and prior Orders on this matter, the evidence presented at the October 24 and November 8, 2013 hearings, the arguments of counsel, and for the reasons expressed herein, this Court finds that the design plan prepared by West Penn Power shall be implemented.

## BACKGROUND AND PROCEDURAL HISTORY

As a preliminary matter, this Court notes that the complicated, contentious relationship between MSA and the Debtors predates the above-captioned bankruptcy cases, and the Court does not intend to recite the entirety of the long history between them. Instead, this Court writes primarily for the parties who are familiar with the current state of the proceedings and how they have developed to this point.

Rock Airport owns an airport and business park, known as Rockpointe Business Park ("Business Park"). MSA owns a parcel of property at the Business Park where it operates a data center. RPP operates an electrical grid which supplies power to businesses located at the Business Park, including MSA. Notably, the parties do not dispute that the transition in the supply of electricity to MSA must occur; rather, the issue is how to accomplish the transition.

Prior to the bankruptcy cases, the parties were involved in state court proceedings stemming from the supply of electricity by the Debtors to MSA. In an effort to resolve the dispute, a Consent Order was entered on July 11, 2008 ("Consent Order", Exhibit F). The

---

[2] Although the Motion was docketed only on the bankruptcy case docket of Rock Airport, the caption of the Motion also identifies Adv. No. 13-2078, *Management Science Associates, Inc. v. RPP, LLC*, related to the bankruptcy case of RPP. The matters before the Court are inextricably intertwined such that this Memorandum Opinion and the accompanying Order will be docketed on all three of the above-captioned dockets.

Consent Order required, *inter alia*, MSA to shift its electrical usage from Debtors to Allegheny Power (now West Penn Power). The Consent Order further required Rock Airport to grant an easement to facilitate said transition, subject to a reasonable and customary fee, provided that such easement would be "consistent with the overall development of the Park[.]" The terms of that order also anticipated that plans to provide MSA with an alternate source of power would be in place within ninety days. The ninety days long passed without a plan to accomplish the transition.

On April 30, 2009, Rock Airport filed a petition for relief under Chapter 11 of the Bankruptcy Code. Although Rock Airport operated as a debtor-in-possession for some time, ultimately a Chapter 11 Trustee was appointed and continues to serve in that capacity. Several years after the Rock Airport bankruptcy case commenced, on February 28, 2013, RPP filed for Chapter 11 relief and remains a debtor-in-possession. These bankruptcy cases were originally assigned to the Honorable Judith K. Fitzgerald. During that time, the appropriate method of transitioning MSA from Debtors' electrical grid to a direct line from West Penn Power remained the subject of much debate. On April 24, 2013, the Court entered an Order providing, *inter alia*, that the timeframe previously set by the Court to accomplish the transfer of electric service was stayed until further Order. Immediately prior to the reassignment of these cases to the Undersigned, on May 30, 2013, Judge Fitzgerald held a hearing on, *inter alia*, the instant matters ("May 30th Hearing").

The May 30th Hearing before Judge Fitzgerald commenced with a status report of the parties' meetings with West Penn Power and the attempts to resolve the issues with MSA by

removing MSA from Debtors' electrical grid.[3] It is clear from the record that there had been discussion of providing electricity to MSA through a direct electrical line under the runway of Rock Airport. However, as there were potential issues with that proposal, it was suggested that, a design study by West Penn Power be commissioned for a cost of $10,000.00 to evaluate whether a better option existed to provide electricity to MSA. Judge Fitzgerald explicitly stated on the record her intent in ordering the design study:

> I'm going to schedule a status conference before Judge [Böhm] in approximately 75 days or so, so that she can follow up on this, and I'm going to make very detailed notes about where -- what I have ordered so far, so that she can pick up and decide what she's going to do from there.
> My recommendation is going to be, based on the order that I'm going to enter today, that will say, "In the event that West Penn Power decides that the best way to do this is to go under the runway, keep the facilities on the west side, then it's going to happen that way. If West Penn Power thinks that there's a better alternative, it's going to happen that way." Whatever West Penn Power wants to do -- you folks haven't been able to agree on anything -- West Penn Power, it seems to me is a perfectly rational enterprise to take a look at what it's going to have to do to own and operate the system. So, however they want it done, that's how it's going to be done.

*See* Transcript of May 30, 2013, at 22. *See also* Transcript of May 30, 2013, at 23-25. Judge Fitzgerald entered the May 31, 2013 Order ("May 31st Order") directing West Penn Power to conduct a design study to determine the appropriate method to transition the electrical service.

Judge Fitzgerald's on the record directives are reflected in the May 31st Order, and the parties were ordered to cooperate with West Penn Power. The Order clearly provided that "one of the West Penn designs shall be utilized to accomplish the transition ordered by this court." In the event the Court would have to choose among designs, the Order set forth the factors that

---

[3]   The Court takes judicial notice of the matters of record at the May 30th Hearing and Orders entered in the Rock Airport and RPP bankruptcy cases. *See* Fed.R.Evid. 201, made applicable in bankruptcy cases by Fed.R.Bankr.P. 9017. *See also Calabria v. CIT Consumer Group (In re Calabria)*, 407 B.R. 671 (Bankr.W.D.Pa.2009).

would be considered in so choosing. A status conference was scheduled to be held by the Undersigned after the conclusion of the design study.

Prior to the scheduled status conference, MSA filed a motion seeking reconsideration or clarification of the May 31st Order, which relief was opposed by the Debtors. On July 18, 2013, upon consideration of the record of the May 30th Hearing, the May 31st Order, and the arguments presented, this Court denied MSA's request to the extent reconsideration was sought. However, to the extent clarification was sought, this Court amended the seventh paragraph of the May 31st Order to replace "and" with "and/or" separating each of the factors the Court would consider in selecting a design for the transition of the electrical supply to MSA. As explained in the July 18th Order:

> [T]o the extent that West Penn Power or any other party misconstrued the [May 31st] Order to require that any proposed design plan must meet *all* of the criteria set forth in Paragraph 7 of the Order in order to be considered as a viable design plan, it cannot be determined prior to the conclusion of the design study whether any design plan can meet all of the criteria listed as Judge Fitzgerald clearly indicated on the record. Therefore, clarification is necessary so as to permit West Penn Power to proceed with its design study regarding placement of the electrical system to MSA's facility. As clearly provided in Paragraph 7, the criteria set forth therein will be applied by the Court in selecting a plan in the event that West Penn Power provides more than one design plan and the parties are unable to reach a consensus in selecting one to be implemented.

*See* July 18, 2013 Order (emphasis in original). The May 31st Order otherwise remained in effect.

On August 27, 2013, the West Penn Power Design ("WPP Design") was filed under seal by the Chapter 11 Trustee of Rock Airport. Although the WPP Design was intended to be addressed at the status conference scheduled on September 10, 2013, MSA filed its Motion seeking implementation of the design on September 3, 2013. The Debtors filed their Response opposing the Motion. Debtors contended that the WPP Design was inconsistent with the

Case 13-20868-CMB   Doc 225   Filed 12/03/13   Entered 12/03/13 13:32:14   Desc Main
Document      Page 6 of 16

development of the Business Park, particularly the planned extension of the airport runway, and proposed several modifications to accommodate anticipated future development. Following a hearing on October 1, 2013, this Court scheduled an evidentiary hearing to address the transition of the electrical supply to MSA, the WPP Design, MSA's Motion, and the Debtors' response thereto.

While it is MSA's position that implementation of the WPP Design is appropriate and in accordance with the prior directives and Orders of this Court, the Debtors' opposition is primarily based on two arguments: (1) the WPP Design is not, in actuality, an independent evaluation but rather an adoption of MSA's proposed route and (2) the design is not consistent with the development of the Business Park as set forth in the July 2008 Consent Order. According to Debtors, both of these problems could have been avoided had Debtors been consulted in the preparation of the WPP Design.

Prior to the commencement of the evidentiary hearing, the parties were directed to meet and confer to narrow and clarify the issues to be decided and file a statement of the agreed upon issues to be resolved by the Court. As the parties were unable to reach a consensus on the statement of issues, each party filed a statement with the Court. The Debtors proposed the following issues:

> Whether the Design Study of West Penn Power dated August 14, 2013 should be implemented or does it unreasonably restrict future development of the Airpark solely to benefit MSA.
> Whether an alternative can be followed that will be consistent with the development of the Airpark and not unreasonably restrict future development of the property solely to benefit MSA.
> Whether, to what extent and on what terms should the Chapter 11 Trustee grant an easement to West Penn Power for the benefit of MSA.

*See* Case No. 09-23155, Doc. No. 476. MSA proposed the following issues:

> Should the Design Study of West Penn Power dated August 14, 2013 be implemented, as previously instructed by the Court, for the installation of a direct electrical line from West Penn Power to MSA at the RockPointe Business Park and should the parties be directed to provide whatever cooperation is necessary to accomplish that installation as expeditiously as possible, including the Chapter 11 Trustee granting an easement to West Penn Power for the benefit of MSA forthwith?

*See* Case No. 09-23155, Doc. No. 477. The Court considers the parties' statements of issues and notes that, aside from the argumentative language coloring each statement, the same analysis is ultimately required.

The evidentiary hearing in this matter commenced on October 24, 2013 and concluded on November 8, 2013. The following witnesses were called to testify: Richard Hobbins, an employee of West Penn Power tasked with proposing a plan to supply MSA with electrical service; Francis Strouse, an aviation consultant and engineer experienced in providing planning, environmental, design, and construction services for airports; Scott Pilston, a professional land surveyor who performed surveying work at the property of Rock Airport; Rock Ferrone, the sole member of the Debtors; Richard Petrie, an electrical engineer assisting in the design of a means to convey electricity to MSA's facility; David Schumacher, an electrician in the area of commercial electrical construction with experience in airport-related work; and Greg Broujos, the managing director of a commercial real estate brokerage firm acting as the listing broker in the Rock Airport bankruptcy case. Following the evidentiary hearing the parties were provided an opportunity to file post-hearing briefs. As the briefs have been filed, the matter is now ripe for decision.

## FINDINGS OF FACT

First, it is clear from the testimony and evidence that plans existed long ago to extend the runway at the Business Park. *See* Exhibit A and Testimony of Strouse, Transcript of October 24,

7

2013, at 87-90, 99. What is less clear is the probability of implementation of those plans. Any plans to extend the runway are not imminent. *See* Testimony of Strouse, Transcript of October 24, 2013 at 113-16, 147-49, 154; Testimony of Ferrone, Transcript of November 8, 2013, at 50-52. Nonetheless, Debtors contend that the WPP Design will negatively impact the expansion plans and the marketability of the Business Park.

Since approximately 2009, the Business Park has been marketed in order to find a buyer for preferably the entire site but, in the alternative, for individual parcels. *See* Testimony of Broujos, Transcript of November 8, 2013, at 82-83. In an effort to market the entire site, emphasis has been placed on the flexibility to develop additional parcels, the ability to sell gas rights associated with the two-hundred-fifty-three acres, and the existence of the currently operating airstrip with the potential for accommodating jet traffic in the event of future expansion of the runway. *See* Testimony of Broujos, Transcript of November 8, 2013, at 82-84. Although the broker secured only one agreement of sale, which sale ultimately did not occur, it has been stated that the potential to expand the runway is a significant selling point for potential purchasers. *See* Testimony of Broujos, Transcript of November 8, 2013, at 82, 85, 87, 101-02. Thus, the Court considers the impact that the WPP Design may have on marketability of the property.

Upon a review of the entire record in this matter, the most noteworthy fact adduced from the testimony and evidence presented at the evidentiary hearing is that only one viable design plan has been approved by West Penn Power as an alternative to the original suggestion that West Penn Power provide electricity to MSA via a line run by MSA under the runway. The Debtors disfavored that initial proposal for several reasons voiced on the record at the May 30th Hearing. *See also* Testimony of Petrie, Transcript of November 8, 2013, at 115-116.

Accordingly, West Penn Power was called upon to perform the design study to provide the Court with a recommendation to accomplish the transition.

Ultimately, the design proposed by West Penn Power was not to the satisfaction of Debtors, and Debtors sought the Court's consideration of alternatives at the evidentiary hearing. Mr. Strouse commented on what he believed to be more favorable design alternatives from an aviation safety perspective, with the primary goal of avoiding the aviation pavement areas. *See* Transcript of October 24, 2013, at 96-97. The Court does not discount the importance of aviation safety but finds it significant that construction under the runway has been approved previously on the north end of the runway. Thus, avoiding the runway may be preferred but not required. *See* Transcript of October 24, 2013, at 143-44. Mr. Strouse testified that the potential placement of the electrical line beyond the southern end of the runway as proposed by West Penn Power was not an impossibility, rather it involved an element of risk. *See* Transcript of October 24, 2013, at 143, 146. Significantly, Mr. Strouse's opinion on feasibility is not based on any experience as a utility provider and is limited to his perspective on aviation safety. *See* Transcript of October 24, 2013, at 163-64. In addition, Mr. Ferrone presented suggestions to the Court regarding placement of the electrical line in light of his proposed future plans for the airport. *See* Transcript of October 24, 2013, at 209-13, 246 and Exhibit OO. Likewise, Mr. Ferrone's design suggestions were not based on any experience as a utility provider. Therefore, aside from mere suggestions proposed by witnesses unqualified to establish the viability of their proposals with any reliability, this Court is presented with the design of West Penn Power.

Only one employee of West Penn Power, Richard Hobbins, was called to testify. Mr. Hobbins' employment requires him to perform engineering and design work for the construction

of West Penn Power distribution and subtransmission facilities, and he was tasked with producing the design plan in this case, which he described as follows:

> We reviewed the overall scope of where the runway is at now, where our existing facilities were at, where property lines were at. And I was directed, or given, a task to come up with an alternate plan to provide MSA their 25 kV metered service that Rock, you [referring to Mr. Reilly, special counsel for Debtors] or Rock had requested to have a metering point on the east side of the runway. We wanted to avoid crossing the runway, and that was the best design that we could lay out.

*See* Transcript of October 24, 2013, at 23-24. *See also id.* at 13. Ultimately, the design produced proposed an electrical line to MSA beyond the south end of the existing runway accomplished through the placement of several manholes and the construction of a conduit in a three-foot deep trench. *See* Transcript of October 24, 2013, at 24-25, 28-29; WPP Design, Exhibit 1.

When questioned as to why he did not consider running an electrical line to MSA's property from a manhole located on the runway's east side at the north end, Mr. Hobbins provided a credible explanation for the rejection of such an option. He explained that it was a less desirable alternative due to the distance between the West Penn Power facilities and MSA's property and due to West Penn Power's intention to avoid intermixing its own facilities with the Debtors' throughout the Business Park. *See* Transcript of October 24, 2013, at 24. Furthermore, the Court does not consider this belated suggestion to be a viable design alternative as no credible evidence was produced to establish as much.

Mr. Hobbins was also asked about the potential for running a line to MSA at the southern end of the runway on the surface referred to as the "apron." With respect to this suggestion, Mr. Hobbins testified that he could not rule out the possibility, but the existence of a steep hillside could pose difficulties and certain steps would need to be taken such as cutting in a road for vehicle access. *See* Transcript of October 24, 2013, at 36-40, 68-69. Mr. Hobbins did not provide

an assurance that such a proposal would, in fact, be a viable, preferential alternative, and the Court does not consider this belated suggestion to be a design alternative as no credible evidence was produced to establish as much.

It is noteworthy that, prior to issuing the design study, no one informed Mr. Hobbins to consider the possibility of the runway extending over the property where he ultimately proposed placement of the electrical line. *See* Transcript of October 24, 2013, at 33, 66-67. Furthermore, notwithstanding the existence of such plans for future extension of the runway, available funding and/or the potential sale of the airport may change those plans. Nonetheless, if in the future the runway is extended over the electrical line, then adjustments would have to be made to accommodate the expansion similar to what was done on the northern end of the runway where an electrical line runs beneath the surface. *See* Transcript of October 24, 2013, at 33-35. Thus, it has not been established that the implementation of the WPP Design precludes the extension of the runway if that plan should come to fruition in the future. Furthermore, the Court finds credible and persuasive that Mr. Hobbins stands by the proposed design as "the most cost-effective and best design to come up with to provide [the] service." *See* Transcript of October 24, 2013, at 24. *See also id.* at 66.

Furthermore, the Court finds that no credible evidence was presented to establish that the Debtors attempted but were prevented from offering input or consultation in the design study performed by West Penn Power. In fact, there appears to have been plenty of opportunities for the Debtors to raise the potential expansion of the runway as a consideration. *See* Testimony of Ferrone, Transcript of October 24, 2013, at 243-247 and Transcript of November 8, 2013, at 7-8. The Court finds that the Debtors had at least notice that placement of the line at the south end of the runway was being considered. *See* Testimony of Ferrone, Transcript of October 24, 2013, at

233-40 and Transcript of November 8, 2013, at 8-21, 160-62. *See also* Transcript of November 8, 2013, at 156-57; Testimony of Schumacher, Transcript of November 8, 2013, at 141-43.

Based upon the foregoing facts, the Court considers the implementation of the WPP Design to accomplish the long awaited transition of electrical services to MSA.

## DISCUSSION

Had there been a simple solution acceptable to all parties to remove MSA from the Debtors' electrical grid, there is no doubt the transition would have occurred long ago. Therefore, it is unsurprising that the WPP Design was met with resistance notwithstanding Judge Fitzgerald's clear and repeated intention to implement whatever design West Penn Power determined to be best. *See* May 30, 2013 Transcript, at 25. Although MSA previously contemplated placement of a meter on the west side of the runway thereby requiring MSA to run a line beneath the runway to its property, that proposal was disfavored by the Debtors and, accordingly, the Court found it appropriate to commission a design study by West Penn Power.[4] As previously stated, this Court has been presented with only one viable alternative by West Penn Power, which Mr. Hobbins has described as the best method to supply the service to MSA. In light of this, the Court considers the Debtors' opposition. In rendering a decision in this matter, this Court is guided by the record of the May 30th Hearing, in particular Judge Fitzgerald's directives to the parties at that hearing, and the resulting May 31st Order.

---

[4] In their Brief, Debtors criticize the prior proposal (referred to by Debtors as "MSA Plan Number One") as it (1) was inconsistent with the development of the Business Park due to the placement of the meter on the west side of the runway, (2) was a misuse of the DQE easement, and (3) required granting an easement to MSA, rather than West Penn Power, as originally agreed. For the reasons discussed on the record at the May 30th Hearing and in light of the WPP Design alternative presently before the Court, the prior proposal is not an option that the Court is considering for implementation nor does it appear that the Debtors favor the prior proposal over the WPP Design. Notably, the WPP Design avoids the concerns of the prior proposal.

First, the Court is not persuaded to discredit the WPP Design simply because the route around the south end of the runway may have been suggested by MSA. Regardless of whether MSA had any knowledge of future plans to expand the runway or whether there exists a possibility that Rock Airport may potentially expand the runway, West Penn Power has submitted the design as the best way to accomplish service to MSA's facility.

Debtors also rely on the July 2008 Consent Order as a basis for rejection of the WPP Design, in particular the requirement that the easement granted for the transition be "consistent with the overall development of the Park[.]" It is not clear how this Court or any other entity should have known from the inclusion of this phrase that Debtors sought to ensure that there would be no interference with the possible future extension of the runway. Had that been a concern as far back as 2008, it is incomprehensible why the Debtors did not raise this issue with this Court long ago, particularly at the time the Court set forth the factors that would be considered in approving a design plan if more than one option was provided by West Penn Power. It is perplexing to this Court why, in light of the litigious history, Debtors sat idly by, all the while knowing the Court's intention to implement a design by West Penn Power, without mention of this concern. The failure to timely bring this matter to the attention of the Court or West Penn Power and the belated attempt to remedy that failure is without justifiable excuse. Furthermore, there is no credible testimony that the implementation of the WPP Design would interfere with the overall development of the Business Park.

Even if the Debtors expected that West Penn Power would provide multiple design options, that does not excuse the failure to raise what they now contend is a major impediment to the marketability and future development of the airport. Furthermore, the Debtors' assumption that West Penn Power's design study would *necessarily* produce multiple options is inconsistent

with the record of the May 30th Hearing and this Court's subsequent clarification of the May 31st Order.[5] As Judge Fitzgerald stated at the hearing:

> However West Penn Power concludes that it should be done, it's going to be done. Now, I recognize West Penn Power *may* say there are three equally viable alternatives, and you folks *may* be back in litigation over which one of them is the best. To the extent that it can be done without going under this runway so that you don't have to cross the west side of the runway, that's going to be the first preference.

Transcript of May 30, 2013, at 24 (emphasis added). This Court did not explicitly require West Penn Power to produce a certain number of design options to consider.

Debtors contend that West Penn Power failed to consult with them during the design study and simply adopted MSA's suggestion. It is unclear why the Debtors inferred that West Penn Power had some duty to consult with them in the preparation of the design study. West Penn Power was not ordered to consult with Debtors. Furthermore, Debtors have not asserted that they attempted to but were prohibited from communicating with West Penn Power. Had Debtors been precluded from providing West Penn Power with relevant information regarding the plans for the airport, Debtors did not seek relief from this Court to provide West Penn Power with that additional factor to consider. Instead, after an approximately seventy-five day, ten-thousand dollar design study was completed, the Debtors now ask for a new design to accommodate a factor that could have been raised in a timely manner. The May 31st Order provides that "all parties shall cooperate with West Penn Power in the effort to accomplish the design study[.]" Had Debtors offered their full cooperation, they would have found a way to provide West Penn Power with all relevant information. Under the circumstances, it is extremely

---

[5] The July 18th Order provides, "[a]s clearly provided in Paragraph 7 [of the May 31st Order], the criteria set forth therein will be applied by the Court in selecting a plan in the event that West Penn Power provides more than one design plan and the parties are unable to reach a consensus in selecting one to be implemented."

difficult to understand why Debtors did not provide notice of the potential for expansion of the runway when Debtors now assign such significance to it.

After-the-fact, Debtors criticize West Penn Power's design study alleging failure to consider other possible routes from its facilities to MSA's property. In particular, Debtors argue that no consideration was given to running service from the north end of the runway where service already exists on the east side. Mr. Hobbins credibly testified why such a route was not ideal. He understood his task to require a proposal of the best design to provide electricity to MSA's property in light of concerns regarding the location of the metering point and running the line beneath the runway. The Court is unpersuaded by the Debtors' belated attempt to offer a new suggestion in light of the credible testimony of Mr. Hobbins in support of the WPP Design. Furthermore, Debtors offered no competing study establishing the feasibility of this suggestion.

Although the Court credits Mr. Broujos' testimony that the potential expansion of the runway is a desirable feature for potential buyers of the Business Park, it is but one selling point identified in marketing the property. Furthermore, it has not been established that the implementation of the WPP Design *precludes* the option to expand the runway in the future. As Mr. Hobbins credibly testified, modifications would have to be made in the event of an extension of the runway over the electrical line.

The Debtors nonetheless contend that placement of the electrical line in the location proposed by West Penn Power will perpetuate the ongoing dispute between MSA and the Debtors. The Court finds this argument unconvincing. Should an expansion take place in the future requiring movement of the electrical line, West Penn Power is familiar with the modification that was required on the north end of the runway and the Debtors have not

established how the potential for a similar adjustment will create an overwhelming hardship on the parties.

Thus, in consideration of Debtors' statement of issues submitted to the Court, the Court finds that the WPP Design should be implemented as it does not unreasonably restrict future development of the Business Park. In fact, no credible evidence establishes that implementation of the design precludes the expansion of the runway should that eventually occur. In consideration of Debtors' issue of "[w]hether an alternative can be followed that will be consistent with the development of the Airpark and not unreasonably restrict future development of the property solely to benefit MSA[,]" Debtors have not provided the Court with a viable, approved alternative to consider, and the transition of electrical service to MSA is long overdue. Accordingly, the Chapter 11 Trustee shall grant an easement to West Penn Power consistent with the WPP Design.

## CONCLUSION

For the foregoing reasons, MSA's Motion is granted to permit the implementation of the WPP Design. An appropriate Order will be entered consistent with this Memorandum Opinion.


DATE: December 3, 2013

__/s/ Carlota M. Böhm_____
Carlota M. Böhm
United States Bankruptcy Judge

**CASE ADMINISTRATOR TO MAIL TO:**
    Heather A. Sprague, Esq.
    Natalie L. Cardiello, Esq.
    David Rudov, Esq., and Rodger L. Puz, Esq.
    Thomas E. Reilly, Esq.
    Elliott J. Schuchardt, Esq.
    Robert O. Lampl, Esq.
    William C. Price, Esq.